[Civ. Nos. 14034, 14207. First Dist., Div. One. Dec. 28, 1950.]

ELSIE I. ROY, Respondent, v. MISSION TAXI COMPANY, INCORPORATED (a Corporation), et al., Appellants.

(Two Cases.)

Hoge, Pelton & Gunther, Leo V. Killion, Reginald M. Watt, Robert H. Gerdes, John T. Briare, Frederick T. Searles, Campbell, Hayes & Custer and Edward J. Niland for Appellants.

James F. Boccardo and Jean M. Blum for Respondent.

WOOD (Fred B.), J.—Defendants Mission Taxi Company, Incorporated (hereinafter referred to as the Taxi Company), and Pacific Gas and Electric Company (hereinafter referred to as the P. G. & E.) appeal from a judgment entered upon a verdict against them for damages for personal injuries sustained by plaintiff while riding as a pay passenger in a cab of the Taxi Company at the time of a collision between it and a panel truck of the P. G. & E.

The Taxi Company's appeal was taken upon the entire record, including a reporter's transcript. That of the P. G. & E. was taken upon a settled statement. Each defendant briefed and at the former hearing orally argued its appeal

upon its own record. At that hearing this court indicated that if it should appear necessary to augment the P. G. & E. record, the court would set the submission aside and give counsel the opportunity to object to any augmentation or to argue the case in view of the augmentation. Subsequently, in writing our former opinion, we overlooked this point and decided both appeals upon the basis of the reporter's transcript. Upon P. G. & E.'s bringing this to our attention, we granted a rehearing of both appeals, ordered the record in the P. G. & E. appeal augmented by the reporter's transcript, already filed in the other appeal, gave the parties opportunity to present supplemental briefs and oral argument and the P. G. & E. an opportunity to object to such augmentation. Subsequently, further briefs were filed and oral argument had, and both appeals submitted, upon the basis of the entire record.

The Taxi Company claims: (1) That the evidence is insufficient to support the verdict against the Taxi Company, in that it shows that the negligence of the P. G. & E. was the sole proximate cause of the accident, and (2) that the giving of an instruction in the language of section 550 of the Vehicle Code was prejudicial error in a case which involves a collision at a through highway intersection.

The P. G. & E. claims: (1) That the evidence is not sufficient to show (a) negligence on the part of its employee or (b) any causal connection between assumed negligence on his part and the accident in question, and (2) that the refusal of its proffered instruction on imminent peril was prejudicial error.

We will consider first the sufficiency of the evidence to support the verdict, as to each appellant.

The collision occurred about 4:30 p. m. on March 26, 1947, at the intersection of Santa Clara and Montgomery Streets in San Jose. Santa Clara runs east and west; Montgomery, north and south. Santa Clara is a through street with arterial stop signs on Montgomery at the intersection, was signposted for a prima facie speed limit of 25 miles per hour, and had a wide white line along its center and a narrower white line (hereinafter mentioned as the single white line) between the center line and the south curb, 10 feet from the center and 31 feet from the curb.

The P. G. & E. panel truck was going north along Montgomery, to turn left on Santa Clara. The driver testified that he stopped for two minutes with the front end of the truck just north of the south curb line of Santa Clara, the

better to observe the traffic (cars were parked along the south curb of Santa Clara) ; that one car was approaching from the west on Santa Clara and he waited for it to clear and then started out in low gear, giving a left turn signal, holding his hand out while traveling a distance of 12 to 15 feet; that he was getting up to the single white line, was traveling 4 to 6 miles an hour and could stop in 2 to 4 feet, when he first saw the cab, then about 200 feet to the west, traveling toward him, in the lane just south of the single white line, at 45 to 50 miles per hour; he then glanced to his right, just a second, to see if he had clearance on that side, during which interval the cab traveled 50 or 60 feet, without diminution of speed until the cab driver put his brakes on when about 75 or 80 feet away; that when he saw the cab he speeded up, straight ahead, to move out of the way, picked up speed to 8 or 10 miles an hour; that a car approaching from the west, between the cab and the south curb of Santa Clara, prevented his stopping and waiting for the cab; if he stopped he would be in the path of that car; that when he saw this other car he had enough clearance to get out of its way at the speed it was going; that he saw this other car before he saw the cab, did not then see the cab because of this other car. Upon the taking of his deposition he said he was passing the single white line when he first saw the cab, which would place him directly in the path of the cab at that moment. He testified that at the time of the collision he was starting to make his turn, the truck was at an angle, its front part had already gotten west of the center line of Montgomery in making his turn, and the rear part was 2 or 3 feet south of the center line of Santa Clara. Then, later, he said the truck was not at an angle over the center of Montgomery at the time he was struck; it was still going straight, that he was just starting to make a turn, was not at an angle at the time of the impact, and indicated on a map, Exhibit M, that his truck was then going straight north, just east of the center line of Montgomery, extending across the inner lane of Santa Clara, its front end just north of the center line of that street. According to a police officer, on the scene a few minutes after the collision, the truck driver then said that he came to a complete stop at the sign, did not see the cab until he had pulled out a little bit, there was a car coming in the extreme outside lane and as he cleared it he saw the cab coming; the cab was then 70 or 75

feet away and the truck was going 5 to 10 miles an hour; and that he tried to increase his speed but could not very well, the truck had a governor on it. The inconsistencies in the truck driver's account of the transaction take on added significance when we consider the fact that during the testimony of the police officer (who made observations and took measurements shortly after the collision), the parties stipulated that the collision occurred at a break in the cab's tire marks on the pavement, and that placed the collision at a point about 4 or 5 feet south of the single white line of Santa Clara and 1 foot 10 inches west of the center line of Montgomery, giving rise to an inference that the driver of the truck started making his left turn before reaching the white line and while in the path of the cab, appreciably more than 10 feet before reaching the center of Santa Clara.

The driver of the Taxi Company's cab testified he was driving easterly on Santa Clara in the lane just south of the single white line, approaching Montgomery Street; that he was about 100 to 150 feet west of Montgomery when he first saw the truck, saw the top of the truck which was cruising across the imaginary pedestrian lane (which crosses Montgomery just south of the south curb line, extended, of Santa Clara); the truck was in motion, traveling 1 to 2 miles an hour (this witness never saw the truck stop at any time, could not say that it had stopped but he did not think it had; according to the police officer, he said shortly after the collision that the truck had stopped); the cab was traveling 25 to 30 miles an hour at the time and slowed down to 20 as it approached the intersection; when the truck had gotten to about halfway between the south curb line and the single white line of Santa Clara it came almost to a stop, not to a dead stop, but the cab driver thought it was going to stop; until then he intended to let the truck pass if it came out, and he was going at 25 to 30 miles an hour, but when he thought the truck was going to stop he stepped on it, figuring he could go through; then the truck driver stepped on it, increased his speed from that point to the point of collision to 8 or 10 miles an hour, moved right out in front of the cab and turned left right into the cab; when the witness saw that, he made a determined effort to stop, his brakes took hold; he was about 30 feet from the intersection (center of the intersection, apparently) when he applied his brakes and went 28 feet after he applied them; he saw no signal of the truck driver's intention to

turn left; he continuously watched the truck until the collision occurred. He said that between the point he was at when he first saw the truck, and the street intersection, he could stop the cab; that during the period he was watching the truck there was a car traveling east on Santa Clara, in the lane next to his right, about 30 feet behind him, going at the same speed he was going; that he knew Santa Clara was signposted for a speed limit of 25 miles per hour. According to the police officer, the cab driver, a few minutes after the collision, estimated he was four car lengths away and going 31 miles an hour when he first saw the truck (a statement which upon the trial the cab driver did not recall making; could not say he did not make it; said he could have made it, but did not recall it), and said the truck driver stopped at the stop sign and then shot across in front of the cab. Upon the taking of his deposition, he said he was about 25 feet from the intersection, from the pedestrian lane closest to you as you approach, when he first saw the truck (which would put the cab at that time about 55 feet from the point of the collision). The truck driver testified that right after the collision he asked the cab driver why he did not stop and he said he slammed on his brakes but they did not seem to hold, a statement which the driver of the cab denied ever having made.

A bystander testified that he saw the truck stopped in Montgomery at about the south line of Santa Clara, did not see it in motion; also, that he heard the cab's brakes squealing, looked up and observed the cab in the lane just south of the single white line on Santa Clara, about 30 feet west of the west line of Montgomery. Asked as to the speed of the cab when he first saw it, he said he did not observe its speed in that position; then, that judging its speed while skidding, knowing the distance skidded and the impact, he did not know if he could answer; finally, that at the very moment he saw it he judged the cab was going at least 50 miles an hour. Counsel for the Taxi Company moved that this testimony as to speed go out because based on conclusions. The court ruled that counsel might argue that point to the jury.

The left front of the cab struck the left rear portion of the truck, damaging the left rear side of the truck and the left front of the cab, turning the truck, which carried a load of one-half to three-quarters of a ton, almost completely

around to face in a southwesterly direction. The front of the cab when it stopped was 8 feet 9 inches, and the truck 9 feet 10 inches, from the point of collision. The skid marks of the cab (which apparently had fourwheel brakes) measured 48 feet 3 inches. The force applied through the brakes of the cab and by the impact of the cars hurled the plaintiff forward from the back seat, over the front seat, and through the windshield, to her serious injury.

From this evidence an appellate court cannot say, as a matter of law, that the cab driver was not negligent or that the truck driver was not negligent, or that the negligence, if any, of either of them was the sole proximate cause of the collision. There are significant inconsistencies in the testimony of each of these two witnesses and conflicts between their respective accounts of what happened, which it was the function of the triers of fact to appraise and resolve. In that process, it was their function to determine the credibility of these and other witnesses and weigh in the physical evidence of the place of collision, the force of the impact, and other attendant circumstances. If the jury found, as it might, that the truck was moving into the first lane of Santa Clara Street when the cab was but 70, 75, 100, or even 150 feet from the intersection (whether the cab was traveling 25, 30, 45, or 50 miles an hour), it might well conclude that the driver of the truck did not exercise due care in entering the intersection, knowing it was a through highway, knowing he had 40 feet to go before completing his left turn, knowing his view was partially obscured by parked cars, and knowing the truck had a slow pickup. The jury might then conclude that he failed to yield the right of way to the cab as a vehicle which was ''approaching so closely on the through highway as to constitute an immediate hazard,'' in violation of a duty imposed by section 552 of the Vehicle Code, and that such failure to yield was a proximate, though perhaps not the sole, cause of the collision. Also, if the jury found, as they might, that he came to almost a dead stop as he reached the lane the cab was in, then went ahead and into his left turn, crossing the center line of Montgomery without signaling or without maintaining the signal until the turn (he said he held his hand out for 12 or 15 feet into Santa Clara), in violation of duties imposed by section 544 and paragraph (2) of subdivision (a) of section 525 of the Vehicle Code, they might conclude these acts also were contributing causes of the collision.

■ As to the driver of the cab, if the jury found, as they might, that he failed to exercise due care, by traveling at such an excessive rate of speed that he could not control his car in meeting a situation reasonably to be anticipated or (if he could stop the cab, as he said he could) by not yielding to the truck, barging on through regardless of consequences, they then might conclude that his conduct was a proximate cause of the collision. The fact that the driver of the truck may not have entered the intersection in such a manner as to give him the right of way under section 552 of the Vehicle Code, would not of itself absolve the cab driver from exercising that degree of care which the law imposes upon every person when driving a vehicle upon a public highway.

It is apparent, therefore, that there is substantial evidence which supports the conclusion reached by the jury and that an appellate court cannot disturb the verdict. (See *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Mason* v. *San Diego Elec. Ry. Co.*, 57 Cal.App.2d 17 [133 P.2d 841]; *Breland* v. *Traylor Eng. etc., Co.*, 52 Cal.App.2d 415, 419-420 [126 P.2d 455]; and *Almanerz* v. *San Diego Electric Ry. Co.*, 15 Cal.App.2d 423 [59 P.2d 513].)

As to the remaining points presented by these appeals, we adopt that portion of our former opinion which dealt with them, an opinion written by Justice Schottky, sitting as Justice pro tempore. It follows, without substantial change.

Appellant P. G. & E. contends that the court committed reversible error in refusing to give instruction No. 67 offered by it, which reads as follows: ''You are instructed that a person, who in driving on a roadway with ordinary care, suddenly and unexpectedly is confronted with imminent peril brought about by the negligence of another, is not bound to use that degree of care which a person of ordinary prudence in calmer moments would use; and under such circumstances if Mr. Liles, the driver of the P. G. & E. truck, attempted to speed up and get out of the way of the Mission Cab, or took the wrong course solely by reason of the imminent peril created by the driver of the Mission Cab, the P. G. & E. could not be held responsible in so doing, if a person of ordinary prudence, under the pressure of the same emergency, might have done the same thing. In other words, the law in this respect is simply plain common sense. You must judge the driver of the P. G. & E. truck in the light of what would be reasonable and proper under the particular circumstances

of this case. Any person can determine how an accident might have been avoided after it has happened. The law does not require the driver of the P. G. & E. truck to anticipate that there is going to be an accident or to act with the utmost wisdom upon being confronted with an imminent peril. He is charged with his foresight rather than his hindsight and he cannot be held responsible for failure to take precautions against the unexpected negligence of Butler, the driver of the Mission Cab, nor is he required to act in an emergency, or in the excitement of an imminent peril created by the driver of the cab, with the same judgment that would be expected of him in the absence of such peril so created.''

No other instruction was given on the subject and we agree with the appellant that a party is entitled to proper instructions as to the law applicable to every material issue of fact when there is some evidence to support his theory of the case. Under the evidence in the case, appellant P. G. & E. was entitled to a proper instruction on the subject of imminent peril, and had a proper instruction been offered we would be inclined to hold that it would be error to refuse to give it. However, the offered instruction is objectionable for many reasons and was properly refused by the court. In at least two places it is clearly calculated to inform the jury that imminent peril was created by the driver of the taxicab and thus invades the province of the jury. It is a type of argumentative and formula instruction which often has been criticized by our appellate courts. A jury should be instructed in concise and understandable language as to the principles of law applicable under the evidence to the case on trial. Argumentative and formula instructions are objectionable because they emphasize certain portions of the testimony, and coming from the court may serve to confuse and mislead the jury. As was said in *Estate of Clark,* 180 Cal. 395, at pages 398-399 [181 P. 639] : ''But it is not the province of the court to make an argument to the jury, and though the giving of an instruction argumentative in form may not always be cause for reversal, it is also true that the court is not bound to give such an instruction even if the argument be a legitimate one, and the refusal thereof is not error. [Citing cases.]'' And as this court said in *Taha* v. *Finegold,* 81 Cal.App.2d 536, at page 543 [184 P.2d 533] : ''Formula instructions should not be given. As said in *Tice* v. *Pacific Elec. Ry. Co.,* 36 Cal.App.2d 66, 71 [96 P.2d 1022, 97 P.2d 844], formula instructions 'are not calculated best

to serve most successfully the administration of justice. Their final disappearance will improve the conduct of court trials.' While the giving of formula instructions is not in itself prejudicial error, the giving of them here, added to the other circumstances of the case, combined to deny the plaintiff a fair trial.'' The prevalent practice of seeking to argue a case in instructions should be discouraged and we have no doubt that if the appellant had offered an instruction giving the law as to imminent peril, as approved by the decisions of our courts, it would have been given by the trial court.

Nor was it reversible error for the trial court to fail to modify or reframe the proposed instruction, for the reason as stated by our Supreme Court in *Nelson* v. *Southern Pac. Co.,* 8 Cal.2d 648, at page 653 [67 P.2d 682]: ''It is next complained that the court did not instruct the jury at all upon the duty of the defendant company to give warning as the train approached the crossing. It is conceded that the instruction offered by the plaintiff was incorrect, but it is insisted that this did not relieve the court of the duty to give a proper instruction upon a relevant issue thus called to its attention. Undoubtedly it would have been proper for the court to instruct the jury on the duty of the defendant to give warning as it approached the intersection (*Bruce* v. *Western Pipe & Steel Co.,* 177 Cal. 25 [169 P. 660] ; *People* v. *Frey,* 165 Cal. 140 [131 P. 127] ), but it has been frequently held that where instructions are offered which cannot properly be given without modification the court may refuse to give them. (*Wiley* v. *Young,* 178 Cal. 681 [174 P. 316] ; *Dover* v. *Archambeault,* 57 Cal.App. 659, 664 [208 P. 178], and cases cited.) ''

Appellant Mission Taxi Company contends that the court erred in giving instruction No. 58 proposed by appellant P. G. & E. That instruction reads as follows: ''You are instructed that Section 550 of the Vehicle Code provides as follows: '550. Vehicle Approaching or Entering Intersection. (a) The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway. (b) When two vehicles enter an intersection from different highways at the same time the driver of the vehicle on the left shall yield the right of way to the driver of the vehicle on the right.' '' Instructions were given as to what constituted an ''intersection,'' what was a ''right of way'' and that vehicles must

stop at through highways (Veh. Code, § 577) and in addition section 552 of the Vehicle Code was given as an instruction, as follows: ''The driver of any vehicle which has stopped as required by this code at the entrance to a through highway shall yield the right of way to other vehicles which have entered the intersection from the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard, but said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right of way to the vehicle so about to enter or cross the through highway.'' Since it is an undisputed fact that the accident here involved occurred at an intersection with a through highway, the Taxi Company claims that the giving of the instruction on section 550 of the Vehicle Code was prejudicial error and this in spite of the fact that the court also gave the law under section 552, appellant citing and quoting from *Elmore* v. *County of Lassen,* 10 Cal.App.2d 229, 232-233 [51 P.2d 481]. That case, however, was overruled on the point for which it is here cited, by *Pattisson* v. *Cavanagh,* 18 Cal.App.2d 123 [63 P.2d 868, 64 P.2d 945], decided by this court in 1936. The Supreme Court in denying a hearing in the latter case said, ''The application is based in part on a conflict between this decision and the decision rendered by the Second Division of the First District Court of Appeal in the case of *Elmore* v. *County of Lassen,* 10 Cal. App.2d 229 [51 P.2d 481]. In so far as that case is inconsistent with the decision in the above-entitled case, we disapprove of the decision in the case of *Elmore* v. *County of Lassen, supra.*'' (P. 130.)

The facts of the Pattisson case were similar to those in this case, except that the car proceeding down the arterial highway and driven by the plaintiff ran off the left-hand side of the road to plaintiff's damage when the defendant came in from the right. The same two instructions were given there as here, and the plaintiff argued on appeal from a decision for the defendant that they were conflicting and that the one dealing with the right of way at intersections in general took from the jury the question as to whether the presence of plaintiff's car constituted an immediate hazard. The court, in the Pattisson case, saying that the question of the negligence of each party was one for the jury, stated: ''We are of the opinion that when all instructions upon the subject of right of way are read and considered together it cannot

be said that they are conflicting or that the jury was misled thereby. The plain import thereof was that ordinarily the driver of an automobile entering an intersection first is entitled to the right of way thereover, but that before entering an arterial intersection he must stop and yield the right of way to any approaching vehicle thereon which constitutes an immediate hazard.'' (P. 127.)

Appellant Taxi Company has cited numerous cases from this and other jurisdictions which appear to support its contention that it was error to give said instruction No. 58, but the latest expression of our Supreme Court upon the subject was its above-quoted language in denying a hearing in *Pattisson* v. *Cavanagh, supra,* 18 Cal.App.2d 123. Therefore, as an intermediate appellate court we feel that we are bound by that decision and must hold that the giving of said instruction was not error.

The judgment appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 19, 1951.